**MARC P. BERGER**
**REGIONAL DIRECTOR**
**Lara S. Mehraban**
**Michael Paley**
**Preethi Krishnamurthy**
**Tejal D. Shah**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0116 (Krishnamurthy)**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **18 Civ. ___ (    )** |
| -against- | |
| **BEAUFORT SECURITIES LTD. and PANAYIOTIS KYRIACOU a/k/a PETER KYRIACOU,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendants Beaufort Securities Limited ("Beaufort") and Panayiotis Kyriacou a/k/a Peter Kyriacou ("Kyriacou") (together, "Defendants"), alleges as follows:

### SUMMARY

1.     In at least early 2018, Defendants Beaufort and Kyriacou—a United Kingdom-based brokerage firm and its U.K.-based investment manager—intentionally facilitated a scheme to manipulate the market of microcap stock publicly-traded in the United States and registered with the Commission.

2.      Starting in 2016, an undercover agent (the "Undercover") with the Federal Bureau of Investigation presented himself to Kyriacou and Beaufort as someone involved in the business of arranging pump-and-dump transactions in U.S. microcap securities.[1]

3.      In December 2017, the Undercover told Kyriacou that he was working on a deal involving a stock traded on the U.S. over-the-counter ("OTC") market, HD View 360 Inc. ("HD View"), and wanted to create the appearance that the stock was actively trading.

4.      Kyriacou suggested that the Undercover engage in what Kyriacou called "match" trading through Beaufort, which Kyriacou said he did "with a lot of clients." Kyriacou later described these trades as selling the Undercover's shares to either the Undercover himself or to the Undercover's "guy." Kyriacou understood that the trades would "game the market."

5.      In January and February 2018, Kyriacou arranged for Beaufort to enter four purchase orders of HD View stock for the Undercover's brokerage accounts. Before Beaufort entered these purchase orders, the Undercover told Kyriacou that the Undercover had arranged for complicit brokerage firms to simultaneously offer to sell an equivalent number of shares from other accounts the Undercover's associates controlled.

6.      One of these purchase orders resulted in a matched trade in which the Undercover's account purchased shares from one of HD View's significant shareholders, with whom the Undercover had previously arranged the matching sell order.

7.      This matched trade almost doubled HD View's stock price.

---

[1]      A pump-and-dump scheme involves fraudulently "pumping" up a stock's price or trading volume so that a shareholder can then "dump" the shares by selling them for a profit.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] and seeks a final judgment: (i) permanently enjoining Defendants from violating Exchange Act Section 10(b), pursuant to Exchange Act Section 21(d)(1); (ii) ordering Defendants to disgorge the ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; (iii) ordering Defendants to pay civil money penalties, pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (iv) permanently prohibiting Defendants from participating in any offering of a penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)(A)]; and (v) ordering any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. §§ 78aa].

12.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices and courses of business alleged here.

13.     Venue lies in the Eastern District of New York, pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting violations of the federal securities laws alleged in this Complaint occurred within the Eastern District of New York. Among other things, Defendants participated in telephone calls, e-mail exchanges, and text messages with the Undercover while he was in the Eastern District of New York.

## DEFENDANTS

14.     **Beaufort** is a U.K.-based brokerage firm. It is not registered with the Commission.

15.     **Kyriacou**, age 26, is a U.K. citizen and resident. He is an investment manager at Beaufort.

## OTHER RELEVANT ENTITY

16.     **HD View** was incorporated in Florida in 2014. It purports to design and install closed-circuit television systems and to distribute network video recorders, high definition cameras, and accessories. Shares of its common stock are registered with the Commission under Exchange Act Section 12(g) and quoted on an OTC market under the ticker symbol "HDVW."

## FACTS

17.     In approximately October 2016, the Undercover first contacted Kyriacou.

18.     Over the next approximately fifteen months, the Undercover repeatedly spoke with Kyriacou (and others at Beaufort) over the phone and in person and communicated with Kyriacou through email and WhatsApp, a text messaging app that uses the Internet to send and receive encrypted messages. In many or all of these phone calls, e-mails, and WhatsApp messages with Kyriacou, the Undercover participated from the Eastern District of New York.

19.     The Undercover presented himself as a U.S. citizen involved in the business of arranging pump-and-dump transactions in U.S. microcap securities, as described further below.

      **A.**       **Beaufort Opens Brokerage Accounts for the Undercover.**

20.      On November 30, 2016, the Undercover and an individual posing as the Undercover's business associate (the "Business Associate") traveled to the U.K. and met with Kyriacou and other Beaufort employees to open brokerage accounts at Beaufort.

21.      The Undercover described himself as "being from New York."

22.      The Undercover and the Business Associate told Kyriacou they were interested in opening six Beaufort brokerage accounts that day and four more accounts later, with each account in the name of a different nominee entity.

23.      The Undercover told Kyriacou that, to avoid the Commission's reporting requirements, the Undercover and the Business Associate wanted to split the stock they owned into multiple brokerage accounts so that no account held 5% or more of the outstanding shares of a securities issuer. The Undercover made clear that, although nominee entities with nominee officers and directors would control the accounts on paper to conceal the Undercover's and his associates' identities and ownership of the stock, the Undercover would provide the trading instructions on all the accounts.[2]

24.      Over the course of the meeting, the Undercover described his business as purchasing shell companies that traded "over the counter…OTC QBs." He depicted his business as "involved in the whole aspect of these firms from the creation…through to the liquidation."

25.      The Undercover said that the companies' stock started out as "very illiquid" and then he "put the management in place" for these companies and directed the management to issue press releases of "news that's not really news" at "certain points in time."

---

[2]     The Exchange Act requires individuals and entities to file a disclosure statement with the Commission after they acquire the beneficial ownership of more than 5% of a class of equity securities registered under Exchange Act Section 12.

26.     Noting that he used "firms in the United States" for publicity, the Undercover explained that "[w]e gotta pump it up…[but] you don't want eyes on the situation."

27.     Kyriacou agreed: "That's what we need. We need for these smaller cap companies, the problem is…when they initially raise money, the news flow goes dry after, and then the share price starts to trickle down…. You need constant news on these companies."

28.     The Undercover told Kyriacou that he sometimes placed matched trades to raise the stock price so that he could sell the stock at a profit: "[S]ometimes we need to trade [the stock] back and forth…do a matched trade here or there, so we can ratchet…you know bid the price up, to get it where we need it to be. Because…we have a hundred million shares of this shell and if we're at a penny or ten cents or whatever, I mean it's a huge difference. The money that could be made on it." The Undercover explained that he hoped to make "five to ten million dollars on each of these deals."

29.     The Undercover eventually said he would need help from Beaufort to sell his shares and that he had a "network of brokers" who would buy the shares when the Undercover wanted to "liquidate" but that the "timing of the trade" would be "critical."

30.     The Undercover later elaborated: "[W]e have firms in the U.S. and elsewhere that'll be more than happy to, you know, put in some buys and sells and…get us…some liquidity."

31.     At one point in the meeting, Kyriacou suggested that the Undercover speak to a Beaufort trader, whom Kyriacou described as someone who "trades…OTC stuff every single day…[and] deals directly with the…U.S."

32.     Kyriacou later explained that Beaufort would charge the Undercover fees "on a pay as you trade basis" by charging a 1% commission on each trade.

33.     At another point in the meeting, the Undercover—making clear he did not want his name listed in Beaufort's account files—noted that he was "somewhat hesitant" to have his name "sitting in a file…at Beaufort."

34.     That day, Kyriacou helped the Undercover fill out account opening forms necessary to open six Beaufort brokerage accounts—each in the name of a different nominee entity and each with a different nominee director.

35.     In January 2017, at Kyriacou's direction, Beaufort opened six brokerage accounts for the Undercover.

36.     A few months later, on April 26, 2017, Kyriacou met the Undercover for lunch in the U.K.

37.     Kyriacou told the Undercover how to communicate with Beaufort concerning the brokerage accounts: "As far as we are concerned, to satisfy our compliance team, no one ever knows [your name], who [you] are, [your name] is a nobody…. [I]n terms of the email correspondences, technically speaking you are not a client of ours…. You don't know about those accounts."

38.     Kyriacou then confirmed that the Undercover should not call Kyriacou on his recorded office telephone line and should instead use WhatsApp.

39.     Kyriacou recommended that the Undercover set up a new email address for each of the Undercover's Beaufort brokerage accounts: "[F]or the new accounts being opened you might want to setup an email address. Have that email address associated with those accounts. And give the orders from that email address…. I can only accept an order from the specified email associated with that account. So it might be helpful for you to set up a specific email for each one of those accounts."

40.     Shortly afterwards, in May 2017, the Undercover told Kyriacou through WhatsApp that the Undercover, following Kyriacou's advice, had created six new email addresses—one for each brokerage account—from which he would send Kyriacou trading instructions.

   **B.     Kyriacou Offers to Facilitate Manipulative Matched Trades.**

41.     In December 2017, at a dinner meeting in the U.K., Kyriacou and the Undercover first discussed a plan to trade HD View stock.

42.     The Undercover told Kyriacou: "What I'd like to do is like kind of prime the pump and just actually, we just want to show some…there hasn't been a lot of liquidity."

43.     Kyriacou replied: "You need some volume, obviously. You'd like to game the market."

44.     The Undercover explained that the reason he needed to show that HD View was liquid "before we kick off our big campaign," was to provide a cover for the friendly brokers who planned to buy HD View stock during the pump and dump.

45.     The Undercover elaborated on his plan to engage in matched trades to create the false appearance that HD View stock was liquid: "The main thing is, I'm looking to create liquidity…. [W]e may need to like coordinate it with you, like when we're going to do it. You know, do a match, do the match trade kind of thing, like when you buy it, and I'll make sure my guy on the sell side is there."

46.     In response, Kyriacou explained that he had prior experience facilitating matched trades and explained how he and Beaufort would execute them: "Crosses – broker to broker crosses. Say if you have your guy on the other side, who will match with us, we can match with him from our side…. You don't want to lose the stock…. I do that with a lot of clients…. [T]hat's standard practice every single day…. Stock x, leaves [your] account at Beaufort…you're essentially buying and selling back to yourself, in theory."

####        C.        Kyriacou Facilitates Two Orders He Intends To Be Matched Trades.

####                1.        The Purchase Order on January 4, 2018

47.        On January 2, 2018, the Undercover, while physically in the Eastern District of New York, called Kyriacou from a cell phone.

48.        The Undercover told Kyriacou that the Undercover was working on the HD View deal but that HD View stock was not actively trading: "The thing is…it's very tight, we control the float, and we're ready to…do a big campaign on this, but right now there's really not…a lot of volume, so what I['m] looking to do…is just do a small little trade just to show some volume."

49.        Kyriacou reminded the Undercover: "As long as they're an authorized brokerage firm, we can…arrange a sort of broker to broker cross. Keep that in mind…where you can essentially sell from…over there to your account over here, or…vice versa. You sell to yourself basically, within the spread of course."

50.        The Undercover continued: "Now, that sounds like a really good way to go because you said it will print too, like it will show the volume and the price?"

51.        Kyriacou replied: "Yea, we always have to print. We always have to print to the market, to show the trade, so it shows volume, shows movement…. You're going to be showing a trade there, you're going to be showing a sell from brokerage X in New York to your Beaufort account in London."

52.        Through WhatsApp, the Undercover later asked Kyriacou to place two orders, each to purchase $1,000 of HD View stock in the Undercover's Beaufort accounts, and represented to Kyriacou that the purchase orders would be matched by sell orders from someone working with the Undercover.

53.     Kyriacou, responding through WhatsApp, agreed to place the purchase orders and directed the Undercover to send Kyriacou emails from the email accounts for each of the Beaufort accounts from which the Undercover wished to execute the trades.

54.     On January 3, 2018, HD View's stock price closed at $0.40 per share.

55.     On January 4, 2018, at 2:17 p.m.,[3] the Undercover instructed Kyriacos in a WhatsApp message: "Please check your email. I will be sending an email in a couple of minutes from [a nominee entity] to do the matched trade for HDVW [HD View]. Please execute at 3 pm your time today to ensure you buy stock from my selling account. I have instructed seller to execute at 3 pm."

56.     Eight minutes later, at 2:25 p.m., the Undercover sent Kyriacou an email with the subject "HDVW stock purchase" from the email address associated with the Beaufort account in the name of the same nominee entity. The email directed: "Please purchase approximately $1,000 USD worth of HDVW stock today. It is a US OTC QB security."

57.     On or before 3:33 p.m., Beaufort entered an order to purchase 1,000 HD View shares at a limit price of approximately $0.80 per share—double HD View's closing price the day before—with a Canadian broker.

58.     The order later reached a U.S.-based market maker for HD View stock (the "U.S. Market Maker"), a broker-dealer registered with the Commission.

59.     The U.S. Market Maker entered the purchase order into OTC Link, a U.S. inter-dealer quotation system used by market makers in OTC market securities.

60.     Unbeknownst to Kyriacou, the Undercover had not actually arranged a sale to match Beaufort's purchase order.

---

[3]     All times listed in this Complaint refer to Greenwich Mean Time (GMT).

61.     At 3:33 p.m., the U.S. Market Maker executed Beaufort's purchase order at approximately $0.80 per share by matching it with a sell order from a customer not connected to the Undercover.

62.     Later the same day, just after Beaufort's purchase order had been executed, sixteen additional trades of HD View stock occurred at prices ranging from $0.70 to $0.80 per share. In at least seven of those instances, the purchasers had no connection to the Undercover.

63.     Beaufort's January 4 executed purchase order nearly doubled the market price of HD View's stock, which had traded at approximately $0.44 per share just before the purchase.

### 2.     The Purchase Order on January 5, 2018

64.     The next day, on January 5, 2018 at 2:24 p.m., the Undercover told Kyriacou in another WhatsApp message: "I would like to buy another $1,000 worth of HDVW stock today in another account at 3 pm your time."

65.     Kyriacou, through a WhatsApp message, advised the Undercover to send him an email from the email address associated with the nominee entity whose name was on that account.

66.     Six minutes later, at 2:30 p.m., the Undercover sent Kyriacou an email from the email address Kyriacou had recommended: "Please…purchase approximately $1,000 USD worth of HDVW stock today."

67.     Fourteen minutes later, at 2:44 p.m., Kyriacou responded: "Hi…will place the order for HDVW with my dealers."

68.     Unbeknownst to Kyriacou, the Undercover had not actually arranged a sale to match Beaufort's purchase order.

69.     On or before 3:47 p.m., Beaufort placed an order to buy 1,000 shares of HD View stock at a limit price of $0.73 per share with a Canadian broker.

70.     The order reached the U.S. Market Maker.

71.     At 3:47 p.m., the U.S. Market Maker executed Beaufort's order to purchase 1,000 HD View shares at $0.72 per share by selling shares to Beaufort from the U.S. Market Maker's own proprietary market-making account.

72.     At approximately 3:50 p.m., HD View's stock price dropped to $0.35 per share.

73.     At approximately 3:51 p.m., Beaufort placed an order to purchase an additional 250 shares of HD View stock at a limit price of $0.73 per share with a Canadian broker.

74.     The order again reached the U.S. Market Maker.

75.     At 3:51 p.m., the U.S. Market Maker executed Beaufort's order to purchase 250 HD View shares at $0.73 per share by matching the order with a sell order from a different customer not connected to the Undercover.

76.     The U.S. Market Maker executed Beaufort's two orders to purchase a total of 1,250 HD View shares at a total price of approximately $902.50.

77.     Later the same day, after Beaufort's two purchase orders had been executed, another investor—not connected to the Undercover—purchased HD View shares at $0.73 per share.

### D.     Kyriacou Facilitates a Purchase Order Resulting in a Matched Trade.

78.     Later that month, on January 25, 2018, the Undercover, while physically in the Eastern District of New York, called Kyriacou from a cell phone to discuss additional matched trades in HD View stock.

79.     The Undercover told Kyriacou: "HDVW…that's one of my big deals I have on the plate right now,…mid-March…we'll probably liquidate a couple million dollars worth of that stock, that we have."

80.     The Undercover explained that nobody was trading the stock: "[Over the] last couple of days there's been no volume, and…I need to continue to create the appearance that you know, for the ultimate investors, that this is a liquid thing, so I can't have…zero volume…trading."

81.     Kyriacou agreed that zero volume was "never a good thing."

82.     The Undercover told Kyriacou: "[W]e'll do a couple like matched trades…. [T]his way me and my group will maintain control of that stock, and then ultimately when we get the price up in March, we'll dump it, and we'll still maintain control of it."

83.     Kyriacou responded: "Yeah, and I'll tell you how it will work. You have to send me a message first, to ensure that 1) I am in the office, and 2) I am available to execute…. And then… you can send me an e-mail…for the order."

84.     The Undercover explained to Kyriacou that Beaufort needed to time the purchase order carefully: "[W]e need to make sure that the account that I'm gonna sell it at…that they need to get the offer out there before we bid for it, because I don't want to buy somebody else's stock."

85.     Kyriacou replied: "[T]hat's fine, no problem."

86.     A few days later, on January 30, 2018, HD View's stock price closed at approximately $0.32 per share.

87.     The next day, on January 31, 2018 at 2:15 p.m., the Undercover sent Kyriacou a WhatsApp message asking if Kyriacou could put in a trade around 3 p.m.

88.     Kyriacou confirmed that he was available.

89.     The Undercover explained: "As soon as I have my friendly place the offer for HDVW I will let you know when to place the order to buy."

90.     At approximately 3:00 p.m., the Undercover arranged for a large HD View shareholder to sell approximately 1,000 HD View shares at approximately $0.63 per share that afternoon. The Undercover made clear to the HD View shareholder that his order would be matched with the Undercover's order.

13

91.     At 3:16 p.m. the same day, the Undercover sent Kyriacou a WhatsApp message directing Kyriacou to purchase 1,000 shares of HD View at $0.63 per share. The Undercover explained: "My guy is offering it at [a U.S. brokerage firm] right now."

92.     Around the same time, the Undercover sent Kyriacou the same purchase instructions from an email address associated with the nominee entity whose name was on the Beaufort account that would purchase the HD View shares.

93.     A few minutes later, on or before 3:28 p.m., Beaufort entered an order to purchase 1,000 shares of HD View stock at a limit price of $0.63 per share—almost double HD View's closing price the day before—with a Canadian broker.

94.     The order reached the U.S. Market Maker.

95.     At 3:28 p.m., the U.S. Market Maker executed Beaufort's order at $0.63 per share by matching it with the large HD View shareholder's matched order to sell HD View shares, as the Undercover had arranged.

96.     Later on January 31, 2018, after Beaufort's purchase order had been executed, another investor—not connected to the Undercover—purchased 1,000 shares of HD View stock at $0.60 per share.

97.     Beaufort's executed purchase order on January 31 almost doubled HD View's stock price.

### E.     Beaufort Enters a Fourth Order in an Anticipated Matched Trade.

98.     On February 1, 2018, HD View's stock price closed at $0.60 per share.

99.     On February 2, 2018, the next day, the Undercover contacted Kyriacou through WhatsApp.

100.    Noting that he was working directly with HD View's chief executive officer, the Undercover asked Kyriacou to place another matched trade.

14

101.     At 2:57 p.m. the same day, the Undercover sent Kyriacou a WhatsApp message with instructions to buy 1,000 shares of HD View immediately at $0.64 per share: "Please execute the trade now. My seller is up there now offering HDVW at [$].64. Please buy 1,000 @ .64 now."

102.     Kyriacou said he was out of the office. He asked the Undercover to send an email with the trade details for Kyriacou to forward to his colleague, who would handle the order in Kyriacou's absence.

103.     At 3:00 p.m., the Undercover sent Kyriacou an email reiterating the purchase instructions from an email address associated with the nominee entity whose name was on the Beaufort account to be used for the purchase order.

104.     On or before 3:20 p.m., Beaufort entered an order to buy 1,000 shares of HD View stock at $0.64 per share with a Canadian broker.

105.     The order reached the U.S. Market Maker, which entered Beaufort's order in OTC Link.

106.     While the Undercover had tried to arrange a sale order that would match his Beaufort purchase order, the U.S. Market Maker did not execute Beaufort's purchase order against the matching sale order, unbeknownst to Kyriacou and Beaufort.

107.     From approximately 3:20 p.m. to 6:22 p.m., the U.S. Market Maker instead executed Beaufort's HD View purchase order at $0.64 per share through OTC Link by purchasing the shares from customers of U.S. brokers. These customers had no connection to the Undercover.

108.     Other than Beaufort's executed purchase order that day, no other trades of HD View stock occurred on February 2, 2018.

## CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5
### (Both Defendants)

109.     Paragraphs 1 through 108 are re-alleged and incorporated by reference as if fully set forth herein.

110.     Defendants Beaufort and Kyriacou, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud, or (b) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

111.     By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have each violated and unless restrained and enjoined will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R.§§ 240.10b-5(a) and (c)].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests a Final Judgment:

## I.

Permanently enjoining Defendants and their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R.§§ 240.10b-5(a) and (c)];

II.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with

prejudgment interest thereon, as a result of the violations alleged in this Complaint;

III.

Ordering Defendants to pay civil money penalties pursuant to Exchange Act Section

21(d)(3) [15 U.S.C. § 78u(d)(3)];

IV.

Permanently prohibiting Defendants from participating in any offering of a penny stock,

including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or

inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act

Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

V.

Granting any other and further relief this Court deems just and appropriate.


Dated:  New York, New York
        March 2, 2018

Marc P. Berger
Lara S. Mehraban
Michael Paley
Preethi Krishnamurthy
Tejal D. Shah
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
Email: KrishnamurthyP@sec.gov